UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA,<br>U.S. Attorney's Office<br>601 D Street, NW<br>Washington, DC 20001,<br><br>      Plaintiff,<br><br>      v.<br><br>$299,218.48 IN UNITED STATES<br>CURRENCY<br><br>      Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil A. No. 22-cv-3304 |

**DECLARATION OF THOMAS TAMSI**

I, Thomas Tamsi, state under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

I. **INTRODUCTION AND SUMMARY**

1. I make this declaration in support of a civil forfeiture complaint alleging that $299,218.48 in U.S. Currency is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it is property that was involved in, and is traceable to property that was involved in, a violation of the international money laundering statute, 18 U.S.C. § 1956(a)(2)(A), that occurred when the defendant currency was transferred from a place outside of the United States to a place within the United States with the intent to promote a specified unlawful activity, *viz.,* a violation of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1705.

2. IEEPA is a specified unlawful activity under the money laundering statute. *See* 18 U.S.C. § 1956(c)(7)(D). Accordingly, it is a violation of the international money laundering statute

to send money from a place outside of the United States to a place within the United States with the intent to promote a violation of IEEPA.

3.      Under 50 U.S.C. § 1705(b), it is a violation of IEEPA to violate or to attempt to violate a regulation issued under IEEPA.  The Export Administrative Regulations (EAR), 15 C.F.R. §§ 730-774 (2015), are regulations issued under IEEPA.  *See United States v. Singer*, 963 F.3d 1144, 1149-50 (11th Cir. 2020).  Accordingly, it is an offense under the international money laundering statute to send money from a place outside of the United States to a place within the United States with the intent to promote a violation of the EAR.

4.      As set forth in detail below, an international money laundering offense occurred when the Defendant property was sent from Russia to the United States as part of a scheme to cause the export of controlled electronic parts from the United States to Russia in violation of the EAR.  Specifically, the Defendant property was sent into the United States as part of a scheme to cause the export of electronic parts to Russia in violation of the regulations requiring the exporter to accurately identify the recipient or "end-user" of the exported items when entering Electronic Export Information (EEI) into the U.S. Government's Automated Export System (AES).  *See* 15 C.F.R. § 764.2(g). Contrary to the regulations, the persons and entities who sent the Defendant property into the United States and who arranged for the purchase and export of the electronic parts did so in a manner that falsely identified the end-user as the Russian Railway when in fact the intended end-user was an entity acting as a front for the Russian military.

## II.       AGENT'S BACKGROUND

5.        I am a Special Agent of the United States Department of Homeland Security, Homeland Security Investigations (HSI).  I have served in HSI since November 2007.  I have training and experience in the enforcement of the laws of the United States, including the seizure of property subject to forfeiture and the preparation, presentation, and service of criminal complaints, and of arrest and search warrants.  I am currently assigned to the HSI Office of the Special Agent in Charge, Denver, Colorado, and work in the Counter Proliferation Investigations Group.  Prior to my employment with HSI, I worked as a Special Agent with the Department of Defense (DOD), Defense Logistics Agency Criminal Investigations Activity, from approximately March 2003 to November 2007 and as a Special Agent with the United States Department of Defense, Air Force Office of Special Investigations, from approximately May 1999 to March 2003. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center.

6.        While working for HSI, I have been involved in investigating violations of federal law including the illegal export of arms and strategic technology commodities from the United States, including violations of the International Emergency Economic Powers Act (IEEPA).  I am familiar with the federal laws relating to the unlawful export of arms and commodities from the United States as regulated, *inter alia,* by the Department of Commerce, Bureau of Industry and Security (BIS), and have participated in numerous investigations of violations of federal law relating to the unlawful export of arms and commodities restricted for export for reasons of national security, foreign policy, anti-terrorism, and embargoed destinations.

7.        The facts in this declaration come from my personal observations, from my training and experience, and from information obtained from other agents and witnesses.  This declaration

is intended to demonstrate only that there are sufficient facts to support a reasonable belief that the United States will be able to establish the forfeitability of the defendant property at trial and does not set forth all of my knowledge about this matter.

**III.      FACTS**

**Agreement between Techson and GCI to purchase parts for the Russian Railway**

8.        Global Circuit Innovations, Inc. ("GCI") is a Colorado-based vendor of electronic parts.   Techson Electronics, Inc. ("Techson") is a California-based company that acquires electronic parts in the United States on behalf of clients in Russia.

9.        On November 6, 2015, GCI – acting through its President, Eric Story -- and Techson – acting through its President, Olga Andreyevskaya -- entered into a contractual agreement ("the Agreement") whereby GCI would sell between 7,000 and 10,000 electronic components manufactured in the United States by Altera Corporation (Part Number: EPM9320ARI208-10) to Techson at a cost of $350 per unit.   The Agreement provided that Techson would provide GCI with a down payment of $648,000 and a valid End User Certificate (EUC) indicating the identity of the customer on whose behalf Techson was acquiring the components.

10.        The components are items controlled by the Export Administration Regulations (EAR).   Pursuant to the EAR, when such items are exported, the exporter must file Electronic Export Information (EEI) in the U.S. Government's Automated Export System (AES).   15 C.F.R. § 758.1(b).   Such filing must include, among other things, an accurate statement identifying the ultimate consignee or end user. *See* 15 C.F.R. § 30.2; 15 C.F.R. § 30.6(a)(3). If the purchaser/importer of the items presents the exporter with a false EUC – *i.e.,* one that does not accurately identify the end user – the exporter will not be able to comply with this requirement.

11.      On November 9, 2015, Techson issued Purchase Order No. 105-11/91 signed by Olga Andreyevskaya indicating that Techson had made or would be making a $648,000 down payment to GCI on a total order of 7,000 of the Altera components.   Based on the $350 unit cost, the total cost of the items purchased was to be $2,450,000.

12.      A review of the contract between IANTO and Techson (Contract 13113) indicated Techson was selling 7000 Altera components to IANTO for $430 each.   Based on the $430 unit cost, the total cost of the items purchased was to be $3,010,000.

13.      Bank records provided by Chase Bank indicate that on the following dates Olga Andreyevskaya directed Chase Bank to transfer the following amounts totaling $648,000 to GCI pursuant to Purchase Order 105-11/91:

| | |
|---|---|
| 12/3/15 | $100,000 |
| 12/4/15 | $100,000 |
| 12/8/15 | $160,000 |
| 12/9/15 | $210,000 |
| 12/14/15 | $ 78,000 |
| | $648,000 |

**The Shipment of samples and the End User Certificate (EUC)**

14.      On April 20, 2016, Techson asked GCI to send a sample of the components.  Four days later, on April 24, 2016, Altera, the manufacturer of the electronic components, shipped 25 samples of the components to an intermediary in New York known as UIP Techno Corp., which in turn, shipped the parts to Russia.

15.      Based on the $430 unit cost shown in the IANTO contract, the value of the 25 units exported was $10,750.  According to, 15 CFR § 30.2 the exporter was required to file an Electronic

Export Information (EEI) with US Customs and Border Protection, which headquarters is located in Washington D.C.  A mandatory element of the EEI is the ultimate consignee which would identify the entity receiving the export.

14.      On May 4, 2016, Andreyevskaya signed a document referencing Purchase Order 105-11/91 and stating that the "Ultimate End User" of Part No. EPM9320AIR208-10 was JSC_OAO "RZhD", the nature of its business was "Russian Rail Road Transport," and \ the parts were intended for "commercial (civil) use."  Attached to this document was an EUC on Techson's letterhead purportedly prepared by its customer in Russia.  The EUC referenced Purchase Order 105-11/91 and stated that Techson's customer was a company called "H-Yustina" and that the end user was JSC OAO 'RZhD', with an address of Novaya Basmannaya, Moscow, RF 107174, website www.rzd.ru – a description that corresponds to the Russian Railway.  Moreover, the EUC stated that the products referenced in the purchase order were "microelectronic systems remotely controlled for the monitoring and management of power supply of rail transport," and that they were to be used for "commercial applications" *not* "military applications."

**Email from Nadezhda Marchenko**

15.      Contrary to the representations made on May 4, 2016, and in the EUC, GCI received an email on May 18, 2016, from Nadezhda Marchenko, Head of Purchasing for Aelek, a Russian company, indicating that Aelek, not "H-Yustina" and not the Russian Railway, was the intended end user of the electronic components.  The email was addressed to Eric Story, President of GCI, and said the following: "Hello Eric! We are representatives of the end use for order EPM9320ARI208-10.  975 pcs are passed due and we want to reduce shipping time . . . . These items should be shipped before May 30 or earlier … ."

16.      On the same day, Eric Story forwarded Marchenko's email to Olga Andreyevskaya at Techson.  Andreyevskaya responded, "We are shocked! I don't know who is Nadezhda Marchenko and why she is allow herself to write this letter.  They are not representative of end user . . . .  Please do not respond to her.  All contact only through Techson Electronics, Inc."

**Connecting Marchenko and Aelek to the Russian military**

17.      On October 6, 2016, as part of an unrelated investigation, HSI agents in Colorado arrested two Russian individuals – Alexey Krutilin and Dmitry Karpenko -- who were attempting to purchase and illegally export radiation hardened integrated circuits to Russia through UIP Techno, the same intermediary that GCI had been instructed by Techson to use for sending the sample components.  When arrested, both Krutilin and Karpenko were operating under false names.

18.      When interviewed on December 9, 2016, Krutilin stated that he worked for a company in Russia called Aelek, and that Nadezhda Marchenko was also an Aelek employee.

19.      When interviewed on December 21, 2016, Karpenko also stated that he worked for Aelek, which is a subsidiary in Russia of company called Abtronics.  According to its website, Abtronics is a Russia-based developer, manufacturer, and supplier of electronic components for air defense missile launchers, electronic warfare equipment, avionics systems, nuclear energy, and space vehicles.  Karpenko stated that he was trained by Nadezhda Marchenko and was instructed on how to prepare end user statements for the items that he purchased in the United States.  He stated that he doubted that any end user statements prepared by Aelek identified the true end user.

**Seizure of Defendant Currency**

20. By the autumn of 2017, HSI had determined, based on the foregoing information, that Aelek was acting on behalf of Abtronics, the supplier of electronics to the Russian military; that Aelek had a history of providing false end-user documentation when attempting to acquire electronic components in the United States; and that any end user representations made by Aelek or its employees to U.S. vendors were likely false.  Moreover, HSI was aware of the Agreement between Techson and GCI to export Altera components to Russia, and that Nadezhda Marchenko, who had written to Story in May 2016 claiming to be the representative of the end user of the Altera components, was an employee of Aelek.  Accordingly, HSI had concluded – notwithstanding Olga Andreyevskaya's denial of any knowledge of Aelek or Marchenko – that the purchase of the Altera components from GCI by Techson was part of a scheme to acquire those parts for something other than commercial use by the Russian Railway, and that accordingly the EUC provided by Techson to CGI representing the end user of the Altera parts to the Russian Railway was false.

21. On October 30, 2017, SA Thomas Tamsi met with Eric Story, President of GCI, in Colorado Springs, CO.  Story explained that he had received $648,000 from Techson, that he had spent more than half of that money in performance of the Agreement, and that only $299,218.48 remained in his possession.  He agreed to surrender those funds to SA Tamsi who seized them for forfeiture.

22. On March 30, 2022, SA Tamsi interviewed Andreyevskaya in Encino, CA. Andreyevskaya stated that a third party known to her as "Artem" – who assisted Techson in finding customers for American merchandise in Russia – arranged for Techson to purchase the Altera components for the Russian Railway through the company known as "H. Yustina."  She explained that the "buyer" sent the $648,000 deposit for the Altera parts to Artem in Russia, who in turn sent

the money from Russia to Techson's account in California, and that she (Andreyevskaya) forwarded the $648,000 to GCI in Colorado.

**Summary**

23.      Based on the foregoing, I conclude that $648,000 was sent from Russia to Techson's account in California to finance the down payment on the Agreement to purchase 7,000 Altera electronic components from GCI in Colorado; that Techson forwarded the $648,000 or property traceable thereto to GCI; and that the $299,218.48 surrendered by GCI on October 30, 2017, was traceable to those funds.  Furthermore, I conclude that the $648,000 was sent from Russia to the United States as part of a scheme to induce the exporter, GCI, to export the electronic components under the erroneous belief that they were intended for commercial use by the Russian Railway; that the EUC provided by Techson to GCI indicating that the Russian Railway was the end user was false; and that it was the intent of the persons and entities who transferred the $648,000 to the United States that the exporter, GCI, would provide false information regarding the actual end user on the EEI when it exported the Altera components, contrary to the EAR.

24. 15 C.F.R. § 764.2(g) provides as follows in pertinent part:

"(g) Misrepresentation and concealment of facts.

"(1) No person may make any false or misleading representation, statement or certification, or falsify or conceal any material fact, either directly to BIS [the Department of Commerce, Bureau of Industry and Security] or an official of any other United States agency, or indirectly through any other person:

"(ii) In connection with the preparation, submission, issuance, use, or maintenance of any "export control document" or any report filed or required to be filed pursuant to the EAR; or

"(iii) For the purpose of or in connection with effecting an export, reexport, transfer (in-country) or other activity subject to the EAR."

25.     Providing a false EUC, indicating that the end user of the Altera parts was the Russian Railway, and intending that GCI, the exporter, would rely on that information in preparing the "export control documents" required by the EAR, constituted the making of – or an attempt to make -- a false or misleading representation of a material fact through a third party to an agency of the United States in violation of Section 764.2(g)(1)(ii).  Moreover, providing the false EUC constituted the making of – or an attempt to make -- a false or misleading representation of a material fact through a third party to an agency of the United States for the purpose of effecting an export or other activity subject to the EAR in violation of Section 764.2(g)(1)(iii).

## IV.     CONCLUSION

26.     For all of the above reasons, I conclude that there are sufficient facts to support a reasonable belief that the Government will be able to establish by a preponderance of the evidence that the Defendant property was involved in a violation of the international money laundering statute, 18 U.S.C. § 1956(a)(2)(A), in that it was transferred – or is traceable to property that was transferred – from Russia to the United States for the purpose of promoting a violation of IEEPA, 50 U.S.C. § 1705(b), which makes it an offense to violate or to attempt to violate a regulation issued under IEEPA, including 15 C.F.R. § 764.2(g), and that accordingly the Defendant property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

Respectfully submitted under penalty of perjury, pursuant to 28 U.S.C. § 1746.

Executed on this 28th day of October 2022.

THOMAS TAMSI
Special Agent
Department of Homeland Security

11